## PROPELLER COMPANY *v.* UNITED STATES.

A vessel was let by its owners to the United States for an indefinite period, not less than thirty days, and the government undertook to pay $150 for each day that she might be employed under the contract, and to bear the war risk. In addition to this the value of the vessel was fixed at $40,000, and it was agreed that should she be retained in the service of the United States until the money paid and due on account of the charter should be equal to such value, she should become the property of the United States without further payment, except of such sum as might then be due on account of her hire under the charter. It was further agreed that if at any time during the continuance of the charter the United States should elect to purchase her, they might take her at $40,000, in which case all money paid and due on account of the charter should be applied on account of the purchase. *Held* that this was not a mere affreightment; that transmission of the ownership of the vessel to the United States was also contemplated; that this transmission was to be at the option of the United States; that in no event were the owners to have more than $40,000 for her, and that this sum might be paid in full by the *per diem* hire, in which case the vessel was to become the property of the government so soon as the hire should equal in amount the price named or at such earlier time as the United States might elect to take her at that price. The vessel having accordingly been lost by a war risk, after $11,397.64 had been paid on account of her hire, the

government was held bound to pay no more than the difference between that sum and $40,000; that is to say, bound to pay no more than $28,602.36.

APPEAL from the Court of Claims; the case being this:

The New Bedford and New York Propeller Company, by a charter-party dated the 5th of April, 1864, chartered a steamer to the United States at $150 per day. The charter-party contained these clauses:

"The war risk is to be borne by the United States, the marine risk by the owner, for a period of thirty days, and as much longer as the service. of the vessel may be required to be employed in such service as the United States may direct.

"The vessel is valued at $40,000, and should she be retained so long in the service of the United States that the money paid and due on account of the charter (deducting therefrom the actual cost of running and keeping in repair the said vessel during the said time, together with a net profit of 33 per cent. per annum on said appraised value) shall be equal to said appraised value, then the said vessel shall become the property of the United States without further payment, except such sum as may then be due on account of the services of said vessel, rendered under the said vessel-charter.

"And, further, if at any time during the continuance of this charter the United States shall elect to purchase the vessel, then they shall have the right to take her at the appraised value at the date of charter, and all money then already paid and due on account of said charter (deducting therefrom the actual cost of running and keeping in repair the said vessel during the said time, together with a net profit of 33 per cent. per annum on the original appraised value) shall apply on account of the said purchase."

The steamer remained in the military service of the government until the 4th of March, 1865, when she was sunk in the Cape Fear River by the explosion of a torpedo placed there by the enemy. The owners presented to the government a claim for $40,000 for the loss of said steamer. This claim being transmitted to the proper officer, he made out an account thus:

Dr.

| | |
|---|---|
| By valuation as per charter, . . . . . | $40,000 00 |
| By 33 per cent. per annum, from 12 M., April 5th, 1864, to 4 P.M., March 4th, 1865, 10 27—3' 4—24 months, . . . . . . . . | 11,996 11 |
| By running expenses, 11 months, at $2100 per month, . . . . . . . . . | 23,100 00 |
| | $75.096 11 |

Cr.

| | | |
|---|---|---|
| To amount received from United States for services from 12 M., April 5th, 1864, to March 4th, 1866, 4 P.M., being 333 6-24 days, at $150, | $49,975 00 | |
| Less 23 5-24 days lost . . . | 3,481 25 | |
| | | $46,493 75 |
| Balance due, . . . . . . . . . | | $28,602 36 |

The amount so found due and no further sum was paid to and received by the owners of the vessel.

In this state of the case the owners filed a petition in the Court of Claims—

| | |
|---|---|
| Claiming as still due, . . . . . . | $11,397 64 |
| In addition to the sum received, viz. . . . | 28,602 36 |
| So as to give the whole valuation, . . . | $40,000 00 |

The Court of Claims found that the steamer was worth $40,000; that the United States never at any time notified to the owners their election to purchase her or to take her under the accruing or purchase clauses of the charter-party above quoted.

And held that "the United States, under such a charter-party, became the equitable owner of the vessel to the extent of the sum earned over and above the expenses and profits stipulated for, and that to the extent of such sum the owners had received so much payment on the price of the vessel, and that whether she was taken by the United States under the option given to purchase at any time, or perished by one of the perils against which the United States engaged to insure, this accruing clause was equally applicable." The court accordingly decreed that it was only the balance due

on the price of the vessel which the original owner could claim, and not the amount of the valuation.

The owners appealed.

*Messrs. N. P. Chipman and T. J. Durant, with whom was Mr. C. F. Peck, for the appellants:*

The government could purchase only during the continuance of the charter-party; but at the time of the alleged purchase, the charter-party had come to an end by the destruction of the vessel. In addition to this, the steamer did not exist; the circumstance of a sale could not be predicated of it; it had ceased to be the subject of such a contract; the owner then had no property to transfer. There can be no valid sale when the subject of the intended sale has no existence.

Even if this were not all plainly true the Court of Claims has committed error. According to its reasoning the United States became joint owners day by day, and while the petitioner would be paying the defendants' (if owner) portion of the expenses of crew and provisions, and of ordinary repairs, defendants (if owner) would be paying petitioner hire for their own (in part) steamer. This is inconsistent with the terms of the contract and the meaning of the parties, and the premises which give rise to such conclusions must necessarily be false.

The contract gives the right of purchase to the United States on the happening of a future and uncertain event; they are not bound to purchase; they might decline to do so; but the petitioner on the happening of the event could not compel the United States to take the vessel.

The obligation was in its nature indivisible, and could not be executed in part; the happening of the event of the net earnings being equal to $40,000, was an entirety; and the clause makes no mention of fractions, so that the obligation is indivisible by the contract and by its nature.*

The contract made by the parties is not to be changed

---

* Parsons on Contracts, vol. 2, p. 520, edition 1866.

under notions of equity. Such a contract as the court below made for them might have been a better one, perhaps, than the one they made, but it is the province of courts to enforce such contracts as are presented, and not to make new ones.

*Mr. G. H. Williams, Attorney-General, contra.*

Mr. Justice STRONG delivered the opinion of the court.

The agreement between the plaintiffs and the United States was not a mere contract of affreightment. The vessel, it is true, was let to hire for an indefinite period, not less than thirty days, and the charterers undertook to pay $150 for each and every day she might be employed under the contract, and to bear the war risk, the marine risk being borne by the plaintiffs. But, beyond this, the contract looked to a sale of the vessel to the charterers at a stipulated price. Her value was fixed at $40,000, and it was agreed that should she be retained in the service of the United States until the money paid and due on account of the charter should be equal to such value (after deducting therefrom the cost of running and keeping her in repair, together with a percentage on her appraised value), she should become the property of the United States without further payment, except of such sum as might then be/due on account of her hire under the charter. Another clause in the agreement stipulated, in effect, that at any time during the continuance of the charter, namely, while the vessel was employed by the charterers, and until she should be returned to the owners at New York, the United States might elect to purchase her, they might take her at her appraised value (viz., $40,000), in which case all money paid and due on account of the charter, after making the deductions above mentioned, it was agreed should be applied on account of the purchase. The plain meaning of these stipulations is that transmission of the ownership of the vessel to the United States was contemplated; that the transmission of ownership was to be at the option of the United States; that in no event were the

plaintiffs to have more than $40,000 for her, and that this sum might be paid in full by the *per diem* hire, in which case the vessel was to become the property of the government so soon as the hire, less the specified deductions, should equal in amount the price named, or at such earlier time as the United States might elect to take her at that price. The plaintiffs, therefore, were in no contingency entitled to more than the price fixed for the vessel by the contract. Whether received as freight or in direct payment of the stipulated price, all money which was paid them, or became due to them, was consideration for the transmission of title, if the United States chose so to regard it. In effect, therefore, the contract vested an equitable ownership in the defendants, proportioned to the money paid and due under the charter. Had a third party, with knowledge of the agreement, bought the vessel from the plaintiffs, he would doubtless have acquired only a right to the purchase-money remaining unpaid at the time of his purchase, if the charterers had afterwards elected to take the vessel during her retention as purchasers, or had retained her until the freight equalled the price agreed upon.

It is true the United States became insurers against war risks, and the vessel was destroyed by such a risk before the freight earned amounted to the appraised value or price. But as insurers they were only bound to make good the loss the plaintiffs sustained, and as the plaintiffs had agreed to sell for $40,000, that loss could not have exceeded what remained unpaid of that sum. It cannot be doubted that the United States had also under the contract an insurable interest. Suppose both they and the plaintiffs had insured severally for their interests, as they might have done, with another underwriter, could more than $40,000, the value of the vessel, have been recovered on both the policies? That will not be maintained. Or, suppose the plaintiffs had insured against marine risks, and the vessel had been lost by one of them. By the contract they undertook such risks. If the vessel had been lost on the day before the freight, less the deductions agreed upon, would have amounted to her

entire value, could the plaintiffs have recovered the whole $40,000, and have retained it, together with the $39,850 paid or due for freight? Would not the policy have enured to the benefit of the United States to the extent of the payments made? To hold that it would not would be giving to the contract a most unreasonable construction. And if not, how can the plaintiffs now be entitled to the whole value of the vessel, in addition to all they have received for her hire, as if no part of her price had been paid, or as if the United States had no interest? We think they are not thus entitled. In our opinion the government had an equitable interest in the vessel at the time she was lost, and as the interest of the plaintiffs amounted to no more than $40,000, which sum they have already received, they have no further just claim.

JUDGMENT AFFIRMED.